**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| JEFFREY KLINGENBERG and<br>JENNIFER KLINGENBERG<br><br>       Plaintiffs,<br><br>vs.<br><br><br>VULCAN LADDER USA, LLC; and<br>G.P. INTERNATIONAL COMPANY<br><br>       Defendants. | No. 15-CV-4012-KEM<br><br>**ORDER** |

---

## *Table of Contents*

I.   **BACKGROUND** ....................................................................................................... 2

II.   **JUDGMENT AS A MATTER OF LAW** .......................................................... 11

  A.   ***Fournier's Expert Testimony*** ........................................................................ 11

  B.   ***Statute of Limitations*** ..................................................................................... 14

  C.   ***Sufficiency of the Evidence for Breach of Express Warranty*** .................... 17

  D.   ***Inconsistency of the Jury Verdict*** ................................................................. 28

III.   **NEW TRIAL** ..................................................................................................... 30

IV.   **INTEREST AND COSTS** ................................................................................ 30

V.   **CONCLUSION** ................................................................................................... 32

     This case involves claims brought under Iowa law by Plaintiffs Jeffrey and Jennifer Klingenberg[1] after Jeffrey fell from a ladder in February 2013 and suffered serious injuries. After a four-day trial, the jury returned a verdict in favor of Defendants,

---

[1] I refer to the Klingenbergs individually by their first names to avoid confusion.

Vulcan Ladder USA, LLC (Vulcan) and G.P. International Company (GP International), on the design-defect claim, but in favor of the Klingenbergs on the breach-of-express-warranty claim. The jury awarded the Klingenbergs more than $2.4 million in damages. Defendants now move for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or, alternatively, for a new trial under Federal Rule of Civil Procedure 59(a)(1)(A). They argue that the Klingenbergs' expert should not have been allowed to testify, that the statute of limitations bars the Klingenbergs' claims against GP International, that no evidence supports the verdict, and that the jury's verdict is inconsistent. They also argue that the great weight of the evidence demonstrates no breach of warranty occurred. I **deny** the motion for judgment as a matter of law and Defendants' alternative request for a new trial (Doc. 128).

## I. BACKGROUND

On February 22, 2013, while working as a home inspector, Jeffrey fell as he attempted to move from the roof of a house onto a Vulcan-branded ladder, and he suffered serious injuries. He had purchased the ladder from a Menards store in September 2011.

The Klingenbergs initiated this lawsuit on January 26, 2015, by filing a complaint in state court against Vulcan. Doc. 1-2. They alleged, among other things, that Vulcan breached an express warranty based on the ladder's label that its working weight limit was 300 pounds and that Vulcan defectively designed the ladder. *Id.* Vulcan removed the case to federal court on February 26, 2015. Doc. 1. In a disclosure statement filed in accordance with the Local Rules on March 18, 2015, Vulcan stated that GP International, a Chinese corporation, was Vulcan's parent company. Doc. 5.

After conducting some discovery, the Klingenbergs moved on July 24, 2015—the deadline to add parties—for leave to file an amended complaint adding GP International and GP International Co., LLC (GP LLC) as defendants. Docs. 7, 9. The Klingenbergs asserted that they were still not sure of the relationship between the parties

and what role the additional defendants had in designing, manufacturing, and distributing the ladder. *Id.* The court granted the motion on August 11, 2015, and that same day, the Klingenbergs filed an amended complaint setting forth the same claims but adding the two additional defendants. Docs. 10, 11. Vulcan and GP LLC quickly filed answers to the amended complaint (represented by the same attorneys), but the Klingenbergs were unable to serve GP International, and counsel for Vulcan declined to accept service on GP International's behalf. Docs. 14-17, 74 ¶ 12.

The case proceeded without GP International. Vulcan and GP LLC filed a *Daubert* motion to exclude the testimony of the Klingenbergs' expert witness, Stephen Fournier. Doc. 26. Vulcan and GP LLC also filed a motion for summary judgment, largely based on the assumption that the Klingenbergs' expert testimony would be excluded. Doc. 25. The court[2] granted summary judgment to Vulcan and GP LLC on the Klingenbergs' manufacturing-defect claim but denied the *Daubert* motion and allowed the rest of the Klingenbergs' claims to proceed. Doc. 39.

On May 30, 2017, having exhausted the requirements for service under the Hague Convention to no avail, the Klingenbergs moved for default judgment against GP International. Doc. 56. Two weeks later, the motion became moot when the attorneys for Vulcan and GP LLC entered their appearance on GP International's behalf and filed GP International's answer. Docs. 57-59, 63. GP International's answer set forth the same boilerplate affirmative defenses that had been in Vulcan's and GP LLC's answers, including a statute-of-limitations defense, and added a defense based on lack of personal jurisdiction. *See* Docs. 4, 14, 17, 58. GP International also filed a disclosure statement as required by the Local Rules, stating that no entities were related to it as a parent, subsidiary, or otherwise and that no other entities had a direct or indirect pecuniary

---

[2] The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa. Judge Bennett presided over the case until the parties consented to the exercise of jurisdiction by a United States magistrate judge in August 2017. Doc. 67.

interest in the outcome of the case. Doc. 61. GP LLC filed the same disclosure statement, as did Vulcan, amending (without explanation) its earlier disclosure statement that had represented GP International was its parent company. Docs. 60, 62. The court allowed the Klingenbergs to conduct additional discovery in the form of depositions to try to discern the relationship between the three defendants. Docs. 74, 83. After the additional discovery, the parties agreed to the dismissal of GP LLC as a defendant and to stipulate that the ladder was designed and distributed by Vulcan and manufactured and sold by GP International. Docs. 99, 107, 113 at 18. They also agreed not to use the additional discovery at trial. Doc. 99.

The court held a final pretrial conference on September 11, 2017 (before the additional discovery had been conducted). Doc. 92. The parties discussed with the court the foreseeable issues for trial, and the court entered a final pretrial order. Defendants made no mention of a potential statute-of-limitations defense, and this defense was not included as a potential issue for trial in the final pretrial order (even though the final pretrial order does note "Defendants will argue at the close of Plaintiffs' case[-]in[-]chief that . . . [GP International] should be dismissed" based on a lack of evidence that it designed and distributed the ladder). Docs. 93, 102.

The parties submitted joint proposed jury instructions. Doc. 86. They requested the model Iowa instructions for design-defect claims and breach-of-express-warranty claims. *Id.* Defendants also proposed the following instruction related to the alternative-design element of the design-defect claim:

> [T]he Court has instructed you to consider "the technological feasibility" of the alternative design. This is also known as "state of the art." Whether or not a reasonable alternative design existed must be tested by what was technologically available at the time of sale, as opposed to what has developed since that time.
> The Defendants contend that the rail bracing design of the . . . ladder was, at the time of sale, state of the art. You have received evidence regarding the [American National Standards Institute (ANSI)] A14.2

4

Standard and [Occupational Safety and Health Administration (OSHA)] 1926.1053 Regulation. Those standards and regulations required this ladder to withstand a thousand pound load when fully extended at 75˚ in the "straight" configuration when a single locking pin (or "J" hook) is engaged. The evidence in this case is uncontroverted that this model of Vulcan ladders met the ANSI testing requirements.

You may consider such evidence in determining whether or not the [ladder] rail bracing design met the state of the art.

Doc. 86 at 12. The Klingenbergs objected that this instruction was based on a withdrawn model Iowa instruction that now stated under "*Wright v. Brooke Group, Ltd.*, 652 N.W.2d 159 (Iowa 2002)[,] . . . 'State of the Art' [is] an element of plaintiff's proof in product liability cases, but remains an affirmative defense under Iowa Code section 668.12." Doc. 86 at 12.

The court submitted proposed jury instructions on September 15, 2017, and included instructions only on the design-defect claim because both sides' model verdict forms contained only that claim. Docs. 88, 89, 94-1. Neither did the court include Defendants' proposed state-of-the-art instruction. Doc. 94-1. The court instructed the parties to file any objections to the jury instructions by 5:00 p.m. on September 20, 2017, or the objection would be deemed waived. Doc. 94. The Klingenbergs objected, requesting instructions on additional claims. Doc. 96. Defendants filed no response. The court filed revised proposed jury instructions on September 21, 2017, which included instructions on breach of express warranty, and ordered the parties to respond by 5:00 p.m. the next day. Docs. 98, 98-1. The court further stated that "[a] party may not object to any portion of these instructions that remains unchanged from the [previous] version" and that "[a]ny objection not included in a party's response will be deemed to be waived." Doc. 98. By email, counsel for Defendants requested additional time to object (Doc. 148 at 1), which the court allowed. When Defendants filed their response to the jury instructions, they had no objections to the instructions on breach of express warranty. Doc. 103. During the pretrial conference on the first day of trial, the court

presented the parties with the final jury instructions and inquired into whether any changes needed to be made. Trial Tr. vol. 1, 4-6.[3] Again, Defendants made no objection to the breach-of-express-warranty instructions. *Id.* The final jury instruction on breach of express warranty included the following elements (as it had throughout the revision process):

> *First*, the Defendants sold the Vulcan ladder and expressly warranted that the working weight load of the ladder was 300 pounds and that it could be used in different positions under the 300-pound working weight.
>
> - An express warranty is any promise by a seller about a product that naturally or ordinarily leads the buyer to purchase the product.
> - For a promise to be an express warranty, no particular form of words have to be used, nor do the terms "warrant" or "guarantee" have to be used, nor does the seller have to intend to make a warranty. The warranty must relate to a fact and not an opinion about the quality or condition of the product sold. An expression of opinion or belief only, a statement of value, or mere words of praise do not create a warranty.
>
> *Second*, the Plaintiffs made the purchase relying on the express warranty.
>
> - The fact that a buyer may, to some extent, rely upon his or her own judgment in purchasing goods does not prevent him or her from also relying upon an express warranty made by the seller.
>
> *Third*, the Vulcan ladder did not conform to the express warranty.
>
> - A product does not conform to an express warranty when defects are substantial and sufficiently serious so that the product fails to materially comply with the express warranty. It is not enough if the defects are small, minor, or insignificant.
>
> *Fourth*, the breach of the express warranty was a cause of the Plaintiffs' damage.
>
> *Fifth*, the amount of damage.

---

[3] The trial transcript is filed at Docs. 130-133.

Docs. 98-1 at 16, 113 at 16; *see also* Doc. 11 at 6; Doc. 86; Iowa Model Civil Jury Instructions 1100.1-1100.4 (2017).

Neither party objected to the verdict form until the second day of trial, when the Klingenbergs objected that the jury should not consider whether Vulcan breached an express warranty separately from whether GP International breached an express warranty; the Klingenbergs argued the jury should consider the Defendants' liability together, so that either Vulcan and GP International were both liable, or both were not. Trial Tr. vol. 2, 334-337. Defendants resisted. *Id.* That night, the parties submitted briefing on the issue by email, and Defendants argued that "[i]t does not matter if a[n] []entity is the seller or the distributor; what matters is who . . . convey[ed] . . . the warranty." Doc. 148 at 2-7. Defendants suggested that the evidence on this issue was different between Vulcan and GP International and argued that the verdict form should therefore require the jury to evaluate their liability separately for the breach-of-express-warranty claim. The parties discussed the issue further at the pretrial conference the next day, where Defendants again argued any entity that communicated the warranty would be liable. Trial Tr. vol. 3, 342-346. Defendants argued that the sticker containing the warranty "[j]ust says Vulcan" and that the ladder contained no reference to GP International. *Id.* at 344. Ultimately, the court expressed no views on the merits of this issue, finding that the Klingenbergs should have raised their objection to the verdict form earlier and that it was waived. Trial Tr. vol. 4, 489-92.

During trial, the Klingenbergs presented testimony from Jeffrey and Fournier (the expert) regarding liability, as well as several witnesses who testified as to damages. They also presented the ladder itself, which had a Vulcan label, but did not offer any evidence distinguishing Vulcan from GP International, apart from the stipulation as to each Defendants' role in designing, manufacturing, and selling the ladder. After the Klingenbergs rested, Defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), and they renewed their motion at the close of all evidence.

Trial Tr. vol. 3, 399-422, 471-72. In the motion, for the first time since GP International filed its answer, GP International argued that the statute of limitations barred any claims against it. *Id.* at 399, 404-18. GP International argued that because it did not have notice of the lawsuit within 90 days of the filing of the original complaint, the amended complaint did not relate back. *Id.* at 406-07. The Klingenbergs objected to this argument as forfeited, arguing that if they had known GP International intended to raise a statute-of-limitations defense, they would have presented evidence on the relationship between GP International and Vulcan to prove that GP International had notice of the lawsuit (including the additional discovery that the parties had agreed to exclude). *Id.* at 407-09.[4] GP International responded that because it raised the defense in its answer, it was entitled not to mention it again "[f]or strategic purposes" until the Klingenbergs rested. *Id.* at 409-10. GP International and Vulcan also renewed the argument that Fournier should not have been allowed to testify as an expert and that if his testimony was excluded, the Klingenbergs could not establish causation for either the design-defect or breach-of-express-warranty claims. *Id.* at 399-04, 418-20; Trial Tr. vol. 4, 493-97. As part of that argument, Defendants contended no breach of warranty occurred because Fournier conceded that the ladder met the standards set forth by ANSI. Trial Tr. vol. 3, 402:20-403:1; Trial Tr. vol. 4, 494-95. The court denied the part of the Rule 50(a) motion that rested on the inadmissibility of Fournier's testimony and reserved ruling on the statute-of-limitations issue until after trial. Trial Tr. vol. 3, 420-21; Trial Tr. vol. 4, 549-50.

Defendants did not specifically move for a directed verdict in favor of Vulcan on the breach-of-express-warranty claim based on a lack of evidence that Vulcan sold the ladder. Neither did they move for a directed verdict in favor of GP International on this

---

[4] Later in the day, after the jury had been excused, the Klingenbergs submitted a short written resistance on the statute-of-limitations issue by email. Doc. 148 at 8-10.

issue.  This, despite Defendants' representation at the final pretrial conference (memorialized in the final pretrial order) that "[b]ecause the only evidence adduced will be that Vulcan is the designer and distributor, Defendants will argue at the close of Plaintiffs' case[-]in[-]chief that GP International . . . should be dismissed."[5]  Doc. 102. And in Defendants' briefing on the verdict-form issue (submitted by email on the evening of the second day of trial), they represented that they would "argue at the close of evidence that . . . Plaintiffs have not adduced evidence on" the issue of who conveyed or communicated the warranty.  Doc. 148 at 5-7.  They did not make such motion.  The court addressed the issue somewhat in ruling on the verdict-form issue, however, which was decided in Defendants' favor, allowing them to argue during their closing argument that the entities should be considered separately (which they ultimately did not do).  Trial Tr. vol. 4, 489-92; *see also id.* at 496-97.

After a four-day trial, the case was submitted to the jury.  The jury found against both Vulcan and GP International on the breach-of-express-warranty claim and awarded the Klingenbergs more than $2.4 million in damages:  $262,000 in past medical expenses, $500,000 in future medical expenses, $72,000 in loss of past earnings, $600,000 in loss of future earning capacity, $200,000 in past loss of full body function, $200,000 in future loss of full body function, $200,000 in past pain and suffering, $200,000 in future pain and suffering, $100,000 in past loss of consortium, and $100,000 in future loss of consortium.  Doc. 115.  The jury found in favor of Defendants and against the Klingenbergs on the design-defect claim, however.  *Id.*

The clerk entered judgment on the jury verdict on September 29, 2017.  Doc. 119.  The Klingenbergs filed a bill of costs, and Defendants moved for a stay of

---

[5] This issue was included in the original final pretrial order, when the parties had not yet entered into the stipulation regarding who designed, manufactured, sold, and distributed the ladder, and it remained as an issue in the amended final pretrial order, which included the stipulation.  *See* Docs. 93, 102.

execution of judgment. Docs. 122, 124. The court granted the motion to stay in part, imposing a temporary stay that would be lifted on November 6, 2017, unless Defendants had filed a supersedeas bond. Doc. 127. The court ordered that "[u]pon the filing by Defendants . . . of a supersedeas bond in the amount of $2,434,000, execution of the judgment shall be stayed until this court has resolved Defendants . . . post-trial motions." *Id.* No bond was ever filed.

Defendants now move for judgment as a matter of law or alternatively, for a new trial. Doc. 128. They argue that testimony from Fournier, the Klingenberg's expert, should not have been admitted; that the statute of limitations bars the express-warranty claim against GP International; that the express-warranty claim fails because no evidence establishes that ANSI standards were violated; that only sellers can be liable for breach of express warranty under Iowa law, and no evidence establishes Vulcan sold the ladder; that the Klingenbergs' damages are limited because they did not purchase the ladder directly from Defendants; and that the jury's finding for Defendants on the design-defect claim precludes a finding against them on the express-warranty claim.[6] The court heard argument on the motion on January 5, 2018. Doc. 147. At the hearing, Plaintiffs made a conditional motion requesting that if Defendants' motion were denied, the court direct execution of the judgment effective immediately, including interest and costs. They argued that the fourteen-day grace period provided for in Federal Rule of Civil Procedure 62(a) has already been exhausted. I agree, *see, e.g., Anastos v. M.J.D.M. Truck Rentals, Inc.*, 521 F.2d 1301, 1302-04 (7th Cir. 1975), and note that the stay I imposed expired months ago (Doc. 127).

---

[6] Defendants raise the inconsistency of the jury's verdict as a basis for judgment as a matter of law, but I believe a finding in their favor would more appropriately result in a new trial. As I do not find their argument meritorious, however, I need not address what relief is warranted.

## II.    JUDGMENT AS A MATTER OF LAW

During trial, after the plaintiffs rest, the defendants may move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).    After trial, "the movant may file a renewed motion for judgment as a matter of law" under Rule 50(b).    A court may grant judgment as a matter of law on a claim when "a reasonable jury would not have a legally sufficient evidentiary basis to find for" the plaintiff.    Fed. R. Civ. P. 50(a)(1), (b).    In evaluating whether a sufficient evidentiary basis exists to support the jury's verdict, the court considers "the evidence in the light most favorable to the verdict, giving the non-moving party the benefit of all reasonable inferences."    *Emmenegger v. Bull Moose Tube Co.*, 324 F.3d 616, 619 (8th Cir. 2003).    The court "do[es] not judge the credibility of witnesses or weigh the evidence."    *Id.*    Judgment as a matter of law is proper when only "[a] mere scintilla of evidence" or "no proof beyond speculation . . . support[s] the verdict."    *Larson ex rel. Larson v. Miller*, 76 F.3d 1446, 1452 (8th Cir. 1996) (en banc) (quoting *City of Omaha Emps. Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 651-52 (8th Cir. 1989)).

### A. Fournier's Expert Testimony

As they have throughout this case, Defendants focus their argument on Plaintiffs' expert testimony from Fournier.    Defendants argue that Fournier should not have been allowed to testify as an expert under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and that without this expert testimony, insufficient evidence exists to support the jury's verdict.    Defendants offer no new arguments based on the trial testimony[7] for excluding Fournier's testimony, instead reasserting that Fournier is

---

[7] I am concerned by what seems to be an inconsistency between Fournier's expert report and his testimony.    His expert report provides that flange and web bending on the ladder placed "stresses on the locking pin" and that "[w]hen the locking pin failed, the ladder moved unexpectedly" and caused Jeffrey's fall.    Doc. 26-2 at 54-55.    It later states that "[w]ithout the strap . . . , the ladder became deformed and one of the locking pins failed."    *Id.* at 56.    At trial,

11

unqualified and that he performed no testing or calculations to support his opinion. Judge Bennett previously addressed these arguments when ruling on Defendants' motion to exclude Fournier's testimony (and criticized Defendants for "failing to acknowledge . . . that [Fournier] has extensive experience as a forensic engineer, that he has investigated over 1,000 construction-related incidents, that over 175 of those incidents involved ladders, and . . . that he has been qualified as an expert 20 times in prior ladder cases"—all facts which Defendants have once again failed to mention). Docs. 26, 34, 39. I see no reason to address Defendants' arguments in depth. Although Fournier has never designed a ladder, he has twenty years of experience working construction sites as a civil engineer, in which he handled ladders regularly and ensured that the construction activity met safety standards; and he has investigated around 200 accidents involving ladders in connection with other litigation. Trial Tr. vol. 2, 214-223; Doc. 31-2 at 5-6; Doc. 117-30 at 1-11. The court did not err in finding Fournier qualified to offer expert testimony. *See Baxter v. Robinette Co.*, No. 5:04CV00222 JLH, 2005 WL 5988679, at *5 (E.D. Ark. Nov. 29, 2005) ("Rule 702 . . . contains no requirement that an expert have designed or have worked with a specific piece of machinery before opining whether the machine was defective. Rule 702 does require that an expert demonstrate qualifications in his particular field.").

---

however, when asked about the "the significance of the broken locking pin," Fournier testified "[n]one really in this instance other than the fact that it, due to the location of the break, more than likely happened . . . during the incident as opposed to being a cause of the incident." Trial Tr. vol. 2, 233. Defendants did not point out this apparent discrepancy at any point during trial, including on cross-examination, and they do not argue it as a basis for excluding Fournier's testimony now. I thus decline to address the issue. (I also note that I allowed, over Defendants' objection, Plaintiffs to use a demonstrative aid of an animation illustrating the accident because I found it consistent with the opinion depicted by Fournier's expert report, and although Defendants re-raised the objection after Fournier testified, they did not point to any discrepancy between his testimony and his expert report. Trial Tr. vol. 1, 9-12, 120; Trial Tr. vol. 2, 254.)

Neither did the court err in finding Fournier's opinion reliable. Fournier based his opinion on general engineering principles; his experience; information from Jeffrey about the accident; and examinations of the accident ladder, design specifications for the accident ladder,[8] competitors' ladders, and photos of the accident scene. Trial Tr vol. 2, 226-27, 239-40, 242; Doc. 26-2 at 51, 54. Testing or calculations are not a necessary prerequisite to the admission of expert testimony, as Defendants contend. *See McRunnel v. Batco Mfg.*, 917 F. Supp. 2d 946, 953 (D. Minn. 2013) (finding expert testimony reliable when "the proposed alternative design exists in the marketplace and [the expert] based his opinion on published engineering standards" after noting that "[t]he Court will not exclude [the expert's] testimony simply because he has never tested his alternative design or subjected his design to peer review"); *Johnson v. Zimmer, Inc.*, No. CIV. 02-1328 JTNFLN, 2004 WL 742038, at *4-5 (D. Minn. Mar. 31, 2004) (denying *Daubert* motion when expert based his opinion "on basic scientific theory and generally accepted and well-documented studies" without conducting independent testing or submitting his theory to peer review); *Thomson v. Gummiwerk Kraiburg Elastik Beteiligungs GmbH & Co.*, No. C02-11 LRR, 2003 WL 22697174, at *2-3, *5 (N.D. Iowa Nov. 13, 2003) (in design-defect case, finding expert's opinion sufficiently reliable when it was based on knowledge acquired from training and experience, personal inspection of the defective machine, documents supplied by counsel, conversations with plaintiff, and review of a sketch of the machine); *see also Manuel v. MDOW Ins. Co.*, 791 F.3d 838, 846 (8th Cir. 2015) (expert testimony on the origin of a fire may be based on "observations at the scene and . . . experience investigating fires"); *Smith v. BMW N. Am., Inc.*, 308 F.3d 913, 919-20 (8th Cir. 2002) (district court erred in excluding doctor's opinions about the cause of plaintiff's injuries and whether air bags would have reduced those injuries when doctor "applied his medical knowledge and his experience to the physical evidence" and "based

---

[8] It does not seem that he examined an undamaged Vulcan ladder before forming his opinion.

his opinion on his knowledge of the basic operation of air bags and his knowledge of how injuries of the type sustained by [plaintiff] occur and can be prevented").

The cases relied on by Defendants are distinguishable. In *Peitzmeier v. Hennessy Industries, Inc.*, 97 F.3d 293, 297-98 (8th Cir. 1996), the Eighth Circuit held the district court did not abuse its discretion by excluding expert testimony of a design defect and alternative design when the expert had "[n]o factual basis . . . that his design changes [we]re feasible," as he had conducted no testing and relied only on rough sketches that had not been made into prototypes. Here, however, the design changes proposed by Fournier are clearly feasible as they have been implemented in competitors' ladders. *See Young v. Pollock Eng'g Grp., Inc.*, 428 F.3d 786, 790 (8th Cir. 2005) (holding that "the experts did not need to conduct a detailed feasibility study" when the defendant had installed the experts' proposed alternative design and used it successfully). Defendants also rely on *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 421-22 (4th Cir. 1993), which does not address the admissibility of expert testimony (and analyzes the evidence needed to prove a design-defect claim under Virginia law, not Iowa law). Defendants cite no authority demonstrating that the admission of Fournier's testimony was an abuse of discretion. The court finds no error in allowing the jury to weigh the qualifications and reliability of Fournier and his methodology.

### B. Statute of Limitations

Because the Klingenbergs amended their complaint to add GP International as a defendant after the statute of limitations had expired, GP International argues that the claims against it are time-barred. The Klingenbergs argue that GP International waived its statute-of-limitations defense by failing to raise it at the final pretrial conference for inclusion in the final pretrial order and that, in any event, the claims against GP International relate back to the filing of the original (timely) complaint.

14

Due to the Klingenbergs' inability to effect service on it, GP International did not file its answer and enter the case as a defendant until June 13, 2017, after the deadline for filing dispositive motions had already passed. Docs. 7, 45, 57-59. In its answer, GP International raised nine affirmative defenses, all of which had also been raised by Vulcan and GP LLC, including a statute-of-limitations defense. Doc. 58. At the final pretrial conference, the parties discussed the potential legal issues to be decided at trial and made no mention of a statute-of-limitations defense. The final pretrial order[9] identified the issues for trial and did include a statute-of-limitations issue: the only issues raised by GP International relate to jury instructions, motions in limine, and its intent to move for a directed verdict based on a lack of evidence that GP International designed or distributed the ladder. Doc. 102. But at trial, after the Klingenbergs rested, GP International moved for a directed verdict on a different basis, raising its statute-of-limitations defense for the first time since filing its answer. Trial Tr. vol. 3, 399-422. GP International argued that no evidence established it had notice of the lawsuit within 90 days of the filing of the original complaint, so the amended complaint did not relate back to the original complaint, and thus, the claims against GP International were time-barred. *Id.* at 406-07. When the Klingenbergs protested that they would have presented evidence on notice had they realized it was an issue, GP International responded that it made a strategic decision not to "broadcast" its statute-of-limitations defense until after the Klingenbergs had rested precisely to prevent the Klingenbergs from presenting such evidence. *Id.* at 407-10.

This type of gamesmanship is not permitted by the Federal Rules of Civil

---

[9] The parties were required to submit a proposed final pretrial order. Doc. 73 at 2; Local Rule 16A(b). The trial management orders contained instructions that the section for "Evidentiary and Other Legal Issues" in the proposed final pretrial order should include "whether recovery is barred as a matter of law by a particular defense." Docs. 8 at 18, 45 at 19, 73 at 21-22.

Procedure.   The purpose of the final pretrial conference is to "promot[e] efficiency and conserve[e] judicial resources by identifying the real issues prior to trial, thereby saving time and expense for everyone."   *Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*, 606 F.3d 494, 498 (8th Cir. 2010) (quoting Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment).   As such, "[a]ttorneys at a pre-trial conference must make a full and fair disclosure of their views as to what the real issues of the trial will be." *Gorlikowski v. Tolbert*, 52 F.3d 1439, 1444 (7th Cir. 1995) (alteration in original) (quoting *Erff v. Marktton Indus., Inc.*, 781 F.2d 613, 617 (7th Cir. 1986)).   And because "the final pretrial order supersedes the pleadings," *Friedman & Friedman*, 606 F.3d at 498, as a general rule, an affirmative defense omitted from the final pretrial order is forfeited (just as it would be if the defendant failed to plead the affirmative defense in its answer), *see Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1304-05 (10th Cir. 2003); *see also Am. Simmental Ass'n v. Coregis Ins. Co.*, 282 F.3d 582, 588-89 (8th Cir. 2002) (recognizing that the "district court [may] refuse[] to allow a party to advance new theories following the entry of a [final] pretrial order" (citing *Anderson v. Genuine Parts Co.*, 128 F.3d 1267, 1271 (8th Cir. 1997))).   Thus, GP International forfeited its statute-of-limitations defense by failing to raise it for inclusion in the final pretrial order.   *See Youren*, 343 F.3d at 1304-05 (defendants waived statute-of-limitations defense by failing to "identify the statute of limitations issue in the pretrial order" as a contested issue of law, despite raising the defense in their answer); *Sidak v. Pinnacle Telemarketing Ltd.*, 182 F. Supp. 2d 873, 880 n.9 (D. Neb. 2002) ("Although [the defendant] generally pleaded a statute of limitations defense in its answer, the defense was not preserved in the final pretrial conference order.   I therefore treat it as waived."), *disapproved of on other grounds by Hassler v. Alegent Health*, 198 F. Supp. 2d 1108 (D. Neb. 2002).[10]   A

---

[10] GP International relies on *Coons v. Industrial Knife Co.*, 620 F.3d 38, 41 (1st Cir. 2010), which held that a party need not raise a statute-of-limitations defense by filing a dispositive motion before trial.   Coons did not address a party's failure to raise a statute-of-limitations

finding of forfeiture is especially appropriate here because the Klingenbergs would have likely presented evidence of the relationship between Vulcan and GP International at trial had they realized that when GP International received notice of the lawsuit was a disputed issue. *See Mannarino v. Morgan Twp.*, 64 F. App'x 844, 847 (3d Cir. 2003) ("Because the statute of limitations argument was not identified in the Pretrial Order, plaintiffs did not have a meaningful opportunity to address its merits at trial"); *see also* Trial Tr. vol. 3, 406-07 (GP International conceded the statute-of-limitations would not bar the Klingenbergs' claims if it had notice of the lawsuit within the time for effecting service of the original complaint under Federal Rule of Civil Procedure 4). I decline to address the merits of Defendants' statute-of-limitations defense.

### C. Sufficiency of the Evidence for Breach of Express Warranty

Defendants argue that because no evidence establishes that ANSI standards were violated, the evidence is insufficient to support a breach-of-express-warranty claim. Specifically, they argue the ladder's label warranted only "that the ladder met ANSI A14.2" standards, and as all the evidence establishes the ladder met those standards, no breach occurred. Doc. 136 at 6-7. The Klingenbergs do not dispute that the ladder met ANSI standards. *See* Doc. 141 at 3-5. Rather, the Klingenbergs argue that the Defendants warranted that the ladder would hold 300 pounds irrespective of whether it met ANSI standards and that this warranty was breached when the ladder "collapsed with less than 300 pounds on it." Doc. 141 at 4-5.

Iowa has adopted the Uniform Commercial Code (U.C.C.), which defines an express warranty as an "affirmation of fact or promise . . . which relates to the goods" or "[a]ny description of the goods"; "formal words such as 'warrant' or 'guarantee' are not necessary." Iowa Code § 554.2313. The jury found that the Defendants

_____

defense in a final pretrial order and is thus inapplicable.

"expressly warranted that the working weight load of the ladder was 300 pounds and that it could be used in different positions under the 300-pound working weight." Doc. 113 at 16. This warranty was based on the accident ladder's label, which read:

Type IA Extra heavy-duty
Industrial Rating
Working Load: 300 [pounds]

Doc. 117-32 at 100. Lower on the label (after the model number, address of Vulcan, and date and place of manufacture), the label stated:

MANUFACTURED TO
OSHA
ANSI A 14.2
SPECIFICATIONS

Doc. 117-32 at 101-102. Under ANSI A14.2, an articulated ladder rated "Extra Heavy Duty – Type IA" must satisfy certain tests demonstrating a working load of 300 pounds. Doc. 117-32 at 40. Thus, Defendants suggest that the warranty created by the words, "Working Load: 300 pounds," must be read in context: immediately preceding the working-load language, the label refers to the ladder's ANSI rating ("Type IA"), which requires the ladder meet tests prescribed by ANSI showing a working load of 300 pounds, and further below, the label explicitly cites the ANSI standard imposing the 300-pound working load for Type IA ladders.[11] Defendants argue the evidence establishes the label warranted only that the ladder complied with ANSI working-load standards to hold 300 pounds.

Although the issue is close, the jury could find that the label warranted "that the working weight load of the ladder was 300 pounds," regardless of whether the ladder satisfied the ANSI working-load tests. The label explicitly stated, "Working Load: 300

---

[11] I further note at summary judgment, the Klingenbergs argued that the ladder's label "expressly warranted that the ladder had an 'Industrial Rating Working Load' of '300 [pounds],'" suggesting that "Industrial Rating" and "Working Load" should be read together. Doc. 39 at 5.

pounds." If Defendants wished to convey only that the ladder satisfied the ANSI working-load standards, they could have omitted the "300 pounds" language and stated only that the ladder was rated "Type IA Extra heavy-duty" and manufactured to ANSI A14.2 specifications. *Cf. Thomas v. Genie Indus., Inc.*, No. 07-1447, 2008 WL 4366067, at *5 (W.D. La. Sept. 22, 2008) (suggesting that if evidence established "which ANSI requirements were not met and how this caused [plaintiff's] damages," defendant would have breached "its warranty . . . that all ANSI requirements were met").[12] The label did expressly warrant that the ladder was manufactured to meet ANSI A14.2 ("manufactured to OSHA ANSI A14.2 specifications"), but the label went further by specifically stating "[w]orking load: 300 [pounds.]" Doc. 117-32 at 101; *see* Doc. 117-32 at 60 (ANSI standards require the ladder's label to state the ladder's "[t]ype and duty rating" and "ANSI standard compliance," but not its working load).[13] Although Plaintiffs' expert, Fournier, testified that the language on the ladder's label meant that the ladder's design satisfied a number of ANSI safety tests for "various load applications," he also opined that the label demonstrated "the ladder's designed for a

---

[12] At least two cases have recognized that the working load on a ladder's label may form an express warranty, although those cases did not address whether the claim would succeed in the absence of proof that ANSI standards had been violated. *See Picken v. Louisville Ladder, Inc.*, No. 11-13044, 2013 WL 3896570, at *1-2 (E.D. Mich. July 29, 2013) (holding that "Plaintiff has provided sufficient evidence to support his express warranty claim" based on unchallenged facts that plaintiff purchased the type IA ladder relying on "weight limit stated on the ladder" that it was "rated to support 300 pounds"); *Solorio v. Louisville Ladder, Inc.,* No. CV-06-0285-EFS, 2008 WL 11336763, at *4 (E.D. Wash. Mar. 7, 2008) ("The Court concludes it is undisputed that the ladder contained a label stating that the ladder could hold up to 300 pounds. It is a question for the jury whether the label constitutes either an 'affirmation of fact or promise' or a 'description of the goods.'").

[13] The ladder's type is "[t]he designation that identifies the working load" (here, IA). Doc. 117-32 at 11, 18, 20. The ladder's duty rating—defined as "[t]he combination of factors, including, but not limited to, ladder types and design features, which imply service capability" —is "extra heavy duty." *Id.* The ladder's type and duty rating is not 300 pounds (although that is the working load required of type IA ladders rated extra heavy duty). *Id.* at 12, 18, 20.

person weighing 300 pounds to be able to use the ladder in a safe manner." Trial Tr. vol. 2, 228.[14]

There is sufficient evidence to establish that this warranty was breached. Jeffrey testified that he weighed "close to 250" pounds when he purchased the ladder, which is why he chose a ladder with packaging saying it could hold 300 pounds. Trial Tr. vol. 1, 179. He testified that as he was moving from the roof of a house to the ladder (with one foot on the ladder and one foot off), the ladder "jar[red]," causing him to fall. Trial Tr. vol. 1, 148, 193. Fournier testified that the outer rail of the ladder became deformed (which would have been prevented by a retaining strap) such that it could no longer sustain its normal load, causing the outer rail to move and in turn causing Jeffrey's fall. Trial Tr. vol. 2, 235-36. Although Fournier acknowledged on cross-examination that the ladder satisfied ANSI standards,[15] he explained that ANSI standards impose minimum safety standards and that "additional testing and additional performance activities . . . should be conducted on ladders . . . to make sure . . . they are safe." *Id.* at 270. Fournier also testified that a product can still be defective, despite meeting ANSI standards,[16] and that no ANSI standard applies to test the particular defect involved in

---

[14] In response to counsel's question asking the meaning of the label saying, "type [I]A extra heavy duty industrial rating working load, 300 pounds," Fournier responded:

> [T]he ladder's designed for a person weighing 300 pounds to be able to use the ladder in a safe manner and . . . with that there are a number of tests that in order to comply with ANSI standards and OSHA standards you need a substantial factor of safety to be able to do that. . . . And they have tests that they have for various load applications.

Trial Tr. vol 2., 228.

[15] Fournier testified on direct examination that after the accident, the ladder did not meet ANSI standards because the outer rail was permanently deformed and thus would "no longer [be] able to sustain the loads that it would normally," but I do not think this is sufficient to establish that the ladder failed to meet ANSI standards before the accident in the face of his explicit acknowledgement on cross-examination. Trial Tr. vol. 2, 232.

[16] Under Iowa law, whether a product conforms to industry standards bears on the issue whether a product is defective, but is not dispositive (and does not satisfy the state-of-the-art defense,

this case. *Id.* at 249-50.   The jury could reasonably find, based on this evidence, that the Defendants breached their express warranty that the ladder would hold 300 pounds.

Defendants rely on *Kolarik v. Cory International Corp.*, 721 N.W.2d 159, 161, 164 (Iowa 2006), in which the Iowa Supreme Court[17] affirmed the grant of summary judgment to defendants on plaintiff's express-warranty claim.   In that case, the plaintiff fractured his tooth when he bit down on an olive pit, and he argued that "the words 'minced pimento stuffed,' contained on the label of the jar of olives, constituted an express warranty that the olives had been pitted." *Id.* at 161, 163.   The vice president of quality control for the olive company agreed that olives must be pitted to be stuffed, but he testified in his deposition that the machines did not always pit every olive because of their varying shapes and that there was no practical method of inspection. *Id.* at 163-64.   The court noted his "statements concerning the inevitability of some pits . . . being in the product w[ere] corroborated by plaintiff's own assertion that United States Department of Agriculture standards for pitted olives allow 1.3 pits or pit parts per one hundred olives." *Id.* at 164.   The court held that this evidence was insufficient to establish that a breach of express warranty occurred. *Id.*   The court noted that, as a rule, "all descriptions by merchants must be read against the applicable trade usages with the general rules as to merchantability resolving any doubts." *Id.* at 164 (quoting U.C.C. § 2-313 cmt. 7).[18]   The court reasoned that "it [wa]s unrealistic to impart to the

---

which "refers to what feasibly could have been done"). *Specht v. Kubota Tractor Corp.*, No. 16-CV-1012-LRR, 2017 WL 2884532, at *4 (N.D. Iowa July 6, 2017) (quoting *Falada v. Trinity Indus., Inc.*, 642 N.W.2d 247, 250 (Iowa 2002)).

[17] In a diversity action involving claims brought under Iowa state law, the court is "bound by the decisions of the [Iowa] Supreme Court regarding issues of substantive state law." *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005).

[18] Stated another way, "[e]xpress warranties . . . must be read in terms of their significance in the . . . trade and relative to what would normally pass in the trade without objection under the contract description." *Kolarik*, 721 N.W. at 164 (quoting *Fargo Mach. & Tool Co. v. Kearney & Trecker Corp.*, 428 F. Supp. 364, 373 (E.D. Mich. 1977)).

description 'minced pimento stuffed' the meaning that defendants are guaranteeing that the olives in the jar are entirely free of pits or pit fragments," and "it [wa]s much more realistic to interpret the description as only warranting that the particular jar of olives contain[ed] pimento-stuffed, green olives that would pass as merchantable without objection in the trade." *Id.* Because no evidence established "that the contents of the jar, taken as a whole, did not live up to this warranty," the plaintiff's breach-of-express-warranty claim failed. *Id.*[19]

Although a close call, I find *Kolarik* distinguishable. The court in *Kolarik* emphasized that the product met standards of merchantability,[20] and the product at issue did not involve a defect of the magnitude here (a pit in a pitted olive as compared to a ladder that collapsed under weight it was supposed to hold). Evidence in *Kolarik* established that there was no way to ensure olives were completely pit-free, but here, Fournier testified that additional testing should have been performed (although he did not specify what type of testing would have uncovered the defect). Further, although the Iowa Supreme Court did not seem to rely on this fact, I note the label in *Kolarik* did not warrant "pitted" olives, but rather, warranted "pimento stuffed" olives (which gave rise to an inference that the olives were pitted). The label here specifically stated "working load: 300 [pounds]" and therefore (unlike in *Kolarik*) "it is [not] unrealistic to impart" to those words the meaning described in Instruction No. 11—that "the working weight of the ladder was 300 pounds and that it could be used in different positions under the 300-pound working weight." That the ladder conformed to ANSI standards does not

_____

[19] The court allowed the plaintiff's negligence claim to proceed, however, holding that "the purchaser of pimento-stuffed olives may reasonably anticipate that the olive pits have been removed" and that "[c]onsistent with this expectation, a seller must exercise reasonable care to assure that this expectation is realized." *Kolarik*, 771 N.W.2d at 166.

[20] I note (discussed further below) that the jury rejected the Klingenbergs' design-defect claim, which requires the same proof as an implied warranty of merchantability claim. *See Wright*, 652 N.W.2d at 181-82.

preclude the Klingenbergs' breach-of-express-warranty claim, and this conclusion is unaffected by *Kolarik*.[21]

Defendants' remaining arguments regarding the sufficiency of the evidence for breach of express warranty are likewise unsuccessful. Defendants argue that Vulcan, the designer and distributor of the ladder, cannot be held liable for breach of express warranty under Iowa law, as no evidence establishes that Vulcan sold the ladder. They also argue that because Jeffrey purchased the ladder from Menards, and not directly from Defendants, he is not in privity with Defendants and therefore cannot recover consequential damages. The Klingenbergs respond that Defendants waived these arguments by failing to raise them in their pre-verdict Rule 50(a) motion. Additionally, the Klingenbergs argue Defendants waived the consequential-damages argument by failing to object to the jury instructions on damages.

A post-trial Rule 50(b) motion "may not advance additional grounds that were not raised in the pre-verdict motion." *Walsh v. Nat'l Computer Sys., Inc.*, 332 F.3d 1150, 1158 (8th Cir. 2003) (quoting *Rockport Pharm., Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195, 197 (8th Cir. 1995)). For a ground to be considered raised by a pre-verdict Rule 50(a) motion, the motion must "specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). "[T]echnical precision is not necessary in stating grounds for the motion so long as the . . . court is aware of the movant's position." *Walsh*, 332 F.3d at 1158 (alteration in original) (quoting *Rockport Pharm.*, 53 F.3d at 197-98). "[T]he purpose of requiring the moving party to

---

[21] The court recognizes that Defendants have consistently argued that they cannot be liable because the ladder meets the ANSI standard. But throughout these proceedings, including at trial, their argument seemed based on the (erroneous) premise that a ladder that meets ANSI standards cannot be defective under Iowa law. Their current argument about what the ladder did (and did not) warrant based on the ANSI standards may not have been sufficiently raised by their Rule 50(a) motion, nor at any other point during trial (e.g., they did not object to Instruction No. 11). As I find there is sufficient evidence to support a breach-of-express-warranty claim under Iowa law, however, I do not address the issue.

articulate the ground on which [judgment as a matter of law] is sought 'is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury.'" *Id.* (first alteration in original) (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998)). "If colloquy between counsel and the trial court fleshes out the motion, it may provide the opposing party with the requisite notice." *Id.*

Here, prior to the close of Plaintiffs' case, in connection with an issue related to the verdict form, Defendants argued that only the party that communicated or conveyed the warranty was liable, and they represented that they intended to move for a directed verdict on this point (although they never did). They elaborated that the sticker containing the warranty "just says Vulcan" and that the ladder contained no reference to GP International, suggesting that GP International could not be liable for breach of express warranty, because no evidence established it conveyed or communicated the warranty. Now, however, Defendants argue that only sellers may be liable for breach of express warranty (a position they explicitly disclaimed in their briefing on the verdict-form issue) and that Vulcan (as opposed to GP International) cannot be liable for breach of express warranty because no evidence established Vulcan sold the ladder.

I am inclined to agree with the Klingenbergs that Defendants have waived this argument by failing to raise it in their Rule 50(a) motion, especially because the argument that they did make on this point during trial (before Plaintiffs rested) is directly at odds with their current argument. They did, however, at least mention this issue during trial: I addressed the issue briefly, and the Klingenbergs were on notice of the need to present evidence on the first element of the breach-of-express-warranty claim. The same cannot be said for Defendants' argument that the Klingenbergs' damages are limited because they were not in privity with Defendants. To my knowledge, this argument was not raised at any point in the proceedings. Moreover, Defendants did not object to the jury instructions on damages, which instructed the jury to award consequential damages.

Doc. 113. I find that Defendants have forfeited the argument that the Klingenbergs' damages are limited to direct, economic damages. *See, e.g, Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 733 (7th Cir. 2004) (holding defendant waived argument that plaintiff could not recover presumed or punitive damages based on plaintiff's failure to prove actual malice, because defendant "fail[ed] to propose a jury instruction requiring a predicate finding of actual malice for general damages or to object to the court's instruction on that ground").

Nevertheless, because I believe the outcome is the same whether or not I address the merits of Defendants' arguments, I will briefly do so. First, Defendants argue that Vulcan—the designer and distributor of the Vulcan-branded ladder—cannot be liable for breach of express warranty because no evidence establishes Vulcan sold the ladder. Defendants do not cite any caselaw in support of their position that only sellers can be liable for breach of express warranty under Iowa law, relying instead on a provision of Iowa's adoption of the U.C.C., which defines how "[e]xpress warranties by the seller are created." Iowa Code § 554.2313. The comments to that section of the U.C.C. provide that "[a]lthough this section is limited in its scope and direct purpose to warranties made by the seller to the buyer . . . , the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract." U.C.C. § 2-313 cmt. 2. The provision relied upon by Vulcan does not stand for the proposition that only sellers can be liable for breach of express warranty—indeed, Iowa case law recognizes that non-sellers may be liable for breach of express warranty in certain instances. *See, e.g.*, *Midland Forge, Inc. v. Letts Indus., Inc.*, 395 F. Supp. 506, 511 (N.D. Iowa 1975) ("Express warranties can be made by distributing advertising literature which contains factual representations relied upon by the ultimate purchaser, even though the latter is not in privity with the manufacturer who made the statements."); *Dailey v. Holiday Distrib. Corp.*, 151 N.W.2d 477, 483 (Iowa 1967) (suggesting that a

manufacturer could be liable for breach of express warranty when "evidence disclos[ed] an[] express warranty was . . . advanced, made or given to plaintiffs by defendant manufacturer"; or when the seller made an express warranty and "acted as agent for" the manufacturer). Here, Vulcan designed the ladder; Vulcan distributed the ladder; and the ladder, which contained a warranty on a label bearing Vulcan's name, ended up at a retail store, where it was purchased by Jeffrey. Defendants cite no authority, and I have found none, holding that a defendant such as Vulcan cannot be liable for breach of express warranty causing personal injury under Iowa law.

Defendants also argue that because the ladder was purchased from a Menards store, rather than directly from them, no privity exists between the parties, and the Klingenbergs are barred from recovering consequential damages—specifically, those damages related to medical expenses, lost earnings, loss of body function, pain and suffering, and loss of consortium. Under the U.C.C. as adopted by Iowa, "[a] seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty." Iowa Code § 554.2318. This is one of three alternatives contained in the U.C.C., all of which are designed to "give certain beneficiaries the benefit of the same warranty which the buyer received in the contract of sale, thereby freeing any such beneficiaries from any technical rules as to 'privity.'" U.C.C. § 2-318 & cmt. 2. The first alternative in the U.C.C. seeks to "include[] as beneficiaries within its provisions the family, household and guests of the purchaser"; under the second alternative (which is the version adopted by Iowa), "the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain"; and the third version "goes further, . . . extending the rule beyond injuries to the person." U.C.C. § 2-3138 cmt. 3. Thus, Iowa Code section 554.2318 abolishes privity as a defense when a defective product causes "personal injury or property damage"—as opposed to merely causing "economic loss," in which case Iowa courts "only allow the buyer to bring a claim under an express

26

warranty for direct economic losses against a remote seller and warranty claims for consequential economic losses against the seller in privity with them." *Des Moines Flying Serv., Inc. v. Aerial Servs. Inc.*, 880 N.W.2d 212, 222 (Iowa 2016); *see also Nationwide Agribusiness Ins. Co. v. SMA Elevator Constr. Inc.*, 816 F. Supp. 2d 631, 683 (N.D. Iowa 2011) ("Section 554.2318 does not extend its warranty protection to third party beneficiaries who have suffered only economic loss, because the term 'injured' has been interpreted by [the Iowa Supreme Court] to include only '*physical harm* to the plaintiff or his property." (quoting *Nebraska Innkeepers, Inc. v. Pittsburgh–Des Moines Corp.*, 345 N.W.2d 124, 129 (Iowa 1984))). Defendants conflate consequential damages with consequential economic damages, relying on cases involving only economic loss, not damages resulting from personal injury. *See Nationwide Agribusiness Ins.*, 816 F. Supp. 2d at 637-38, 685 (defendants sought to recover "'consequential economic loss damages,'" not personal injury damages); *Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103, 105, 107-08 (Iowa 1995) (defendant sought to recover lost profits and loss of good will for damages to cattle he did not own, which are "consequential economic loss damages"); *Beyond the Garden Gate, Inc. v. Northstar Freeze-Dry Mfg., Inc.*, 526 N.W.2d 305, 310 (Iowa 1995) (plaintiff could recover the difference between what it paid for the machine and what it sold it for under its breach-of-express-warranty theory against a nonprivity seller, but it could not recover "consequential economic loss damages," including "repair bills, . . . lost training profits, and lost business profits"); *see also Kolarik*, 721 N.W.2d at 163 (a plaintiff who bit into an olive and chipped his tooth "falls within th[e] extended class of beneficiaries" protected by Iowa Code section 554.2318). Because this is a personal-injury case, and the evidence establishes that the Klingenbergs suffered damages beyond economic loss, lack of privity between the Klingenbergs and Defendants does not preclude a breach-of-express-warranty claim nor limit the Klingenbergs' damages.

### D. Inconsistency of the Jury Verdict

Defendants argue that "[t]he jury's verdict of 'no design defect' precludes a verdict of breach of express warranty under Iowa law." Defendants rely on *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 181-82 (Iowa 2002), which held that "personal injury plaintiffs are permitted to seek recovery under tort and warranty theories that in essence allege the same wrongful acts," but a claim for breach of the implied warranty of merchantability requires the same "proof of a product defect" as a tort claim. Defendants argue that just as with implied-warranty-of-merchantability claims, breach-of-express-warranty claims require proof of product defect in tort.

The jury instructions on the breach-of-express-warranty claim required the jury to find that Defendants warranted that "the working weight load of the ladder was 300 pounds" and that "the Vulcan ladder did not conform to" that warranty because of "substantial and sufficiently serious" defects. Doc. 113 at 16. The instructions on breach of express warranty did not specifically include a requirement that the jury find a reasonable alternative design existed at the time of the sale of the ladder, as the design-defect instructions did. Doc. 113 at 14. The jury was troubled by the alternative-design element, as evidenced by the jury question asking whether the exemplar ladders from different brands using an alternative design were "new models" or whether they existed in 2011. Doc. 114.

The parties requested the Iowa model instructions on breach of express warranty and on design defect. Defendants made no objections to the jury instructions before or during trial, despite multiple opportunities. They did not raise the possibility of an inconsistent verdict. Nor did Defendants argue that the jury's verdict was inconsistent at any point before the jury's discharge—indeed, this issue is raised for the first time in the current briefing.

First, courts "evaluate whether verdicts are consistent in light of how the jury was instructed, not retrospective arguments about what the law is (which are really just late arguments about how the jury should have been instructed)." *S.E.C. v. Quan*, 817 F.3d 583, 589-90 (8th Cir. 2016). Here, it seems likely that the jury credited the testimony of Fournier and Jeffrey and found the ladder defective but did not find that the Klingenbergs had proved the existence of a reasonable alternative design at the time of the ladder's manufacture. Thus, the jury's finding for Defendants on the design-defect claim and against them on the express-warranty claim can be reconciled based on the required elements for each as listed in the instructions.

Even if the jury verdict was inconsistent, however, "[i]t is well established, at least in [the Eighth Circuit], that a party waives any objection to an inconsistent verdict if she fails to object to the inconsistency before the jury is discharged." *Williams v. KETV Television, Inc.,* 26 F.3d 1439, 1443 (8th Cir. 1994). The purpose of this rule is "'to allow the original jury to eliminate any inconsistencies without the need to present the evidence to a new jury' and to 'prevent[] a dissatisfied party from misusing procedural rules and obtaining a new trial for an asserted inconsistent verdict.'" *Yazdianpour v. Safeblood Techs., Inc.*, 779 F.3d 530, 538-39 (8th Cir. 2015) (alteration in original) (quoting *Lockard v. Mo. Pac. R.R. Co.*, 894 F.2d 299, 304 (8th Cir. 1990)). The Eighth Circuit has declined to excuse the failure to object to an inconsistent verdict before the jury's discharge when defendants "waited more than a month to raise their objection" and did not raise the issue of an inconsistent verdict at any point during the trial. *See id.* at 538 & n.4; *cf. Quan*, 817 F.3d at 588 (suggesting that the forfeiture rule may not apply when a defendant "pointed out an alleged inconsistency, but did not formally request relief"). Defendants have forfeited their argument that the jury's finding for them on the design-defect claim is inconsistent with its finding against them on the express-warranty claim.

### III.   NEW TRIAL

"A motion for new trial based on sufficiency of the evidence should be granted only if the verdict is against the weight of the evidence." *S.M. v. Lincoln County*, 874 F.3d 581, 589 (8th Cir. 2017); *see also* Fed. R. Civ. P. 59(a)(1)(A).   "[T]he district court 'can rely on its own reading of the evidence—it can "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict."'" *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 459 (8th Cir. 2016) (quoting *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992)).   This test has sometimes been phrased as against the "clear weight" of the evidence, or "great weight," or "overwhelming weight," but "'[r]egardless of the rhetoric used[,] the true standard for granting a new trial . . . is simply . . . whether a miscarriage of justice has occurred.'" *White*, 961 F.2d at 780 (quoting *Fireman's Fund Ins. Co. v. Aalco Wrecking Co.*, 466 F.2d 179, 187 (8th Cir. 1972)).

As discussed above, Jeffrey testified that he fell when the ladder moved, and Fournier testified that the ladder's outer rail bent due to a lack of a retaining strap, and the ladder could no longer bear loads normally.   The jury could credit Fournier's testimony over Defendants' expert and find the deformed outer rail caused the ladder to be unable to hold loads of 300 pounds, as warranted.   The weight of the evidence does not support a finding otherwise—this case came down to which expert the jury believed, and merely because the jury credited Fournier's testimony over Defendants' expert does not mean that a miscarriage of justice has resulted.   *See Keeper v. King*, 130 F.3d 1309, 1315 (8th Cir. 1997).


### IV.   INTEREST AND COSTS

The Klingenbergs orally moved at the hearing for judgment to be amended to include interest and costs.   They are entitled to costs as requested (Doc. 124) under Federal Rule of Civil Procedure 54(d)(1).   They are also entitled to postjudgment interest

on the entire award (including the amount awarded by the jury, costs, and any prejudgment interest) under 28 U.S.C. § 1961. *See also Sociedad Espanola de Electromedicina y Calidad, S.A. v. Blue Ridge X-Ray Co.*, 226 F. Supp. 3d 520, 537 (W.D.N.C. 2016).

"The award of prejudgment interest in a diversity action is determined by the law of the state in which the action arose." *California & Hawaiian Sugar Co. v. Kan. City Terminal Warehouse Co.*, 788 F.2d 1331, 1333 (8th Cir. 1986). Although the Klingenbergs did not specifically request prejudgment interest, "[t]he Iowa Supreme Court has stated that '[t]he award of [prejudgment] interest is mandatory and should be awarded even when interest has not been requested.'" *Purina Mills, L.L.C. v. Less*, 295 F. Supp. 2d 1017, 1048 (N.D. Iowa 2003) (quoting *Hughes v. Burlington N. R.R. Co.*, 545 N.W.2d 318, 321 (Iowa 1996)). Generally, prejudgment interest on tort judgments involving personal injury is governed by Iowa Code section 668.13, which authorizes prejudgment interest for past damages (but not future damages) that "accrue[s] from the date of the commencement of the action." Iowa Code § 668.13(1), (4); *see also Waterloo Sav. Bank v. Austin ex rel. Austin*, 494 N.W.2d 715, 717 (Iowa 1993). In other words, "section 668.13 . . . provides for interest on damages sustained prior to trial from the date of the commencement of the action." *Gosch v. Juelfs*, 701 N.W.2d 90, 92 (Iowa 2005).[22] Accordingly, the Klingenbergs are entitled to prejudgment interest on $834,000 (the damages for past medical expenses, loss of past earnings, past loss of full body function, past pain and suffering, and past loss of consortium) from January 26, 2015, until the entry of the final amended judgment. *See Schulte v. Feterl Mfg. Co.*,

---

[22] Prejudgment interest may accrue earlier if allowed under the common law, *Gosch*, 701 N.W.2d at 92, but prior to the enactment of section 668.13, "[c]laims for [nonfatal] personal injuries were ordinarily denied prejudgment interest," *Balster v. State*, 360 N.W.2d 788, 790 n.2 (Iowa 1985)

No. C92-4038, 1993 WL 13015647, at *9 (N.D. Iowa Aug. 30, 1993) (awarding prejudgment interest under Iowa law "on plaintiff's award for past pain and suffering, past medical expenses, and past disability and disfigurement only").

## V. CONCLUSION

The jury had a legally sufficient evidentiary basis to find for the Klingenbergs on their express-warranty claim, and the verdict is not against the great weight of the evidence. I therefore **deny** Defendants' renewed motion for judgment as a matter of law and their alternative request for a new trial (Doc. 128).

The Clerk of Court is directed to enter an amended final judgment in the amount totaling $2,434,000 (as set forth in the original judgment filed at Docket No. 119), plus costs; prejudgment interest on $834,000 from January 26, 2016, to the date of entry of final judgment at the rate provided in Iowa Code section 668.13(3); and postjudgment interest on the entire award (including prejudgment interest and costs) at the rate provided in 28 U.S.C. § 1961(a).

**IT IS SO ORDERED** this 9th day of March, 2018.

Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa